UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

UNITED STATES OF AMERICA

v. No. 5:19-cr-53-BJB

MARVIN L. UPTON

\* \* \* \* \*

<u>MEMORANDUM OPINION & ORDER
GRANTING MOTION TO WITHDRAW GUILTY PLEA</u>

  This is a strange and sad criminal prosecution that involves two enfeebled parishioners, a deceased co-defendant, hundreds of thousands of dollars in questionable church gifts and spending, allegations that date back to 2013, and a widowed defendant who's wavered in his willingness to admit guilt or go to trial. Marvin Upton (a boilermaker and lay pastor) and Cynthia Upton (his wife) were charged in 2019 with conspiracy to commit bank fraud, bank fraud, and filing a false tax return in a seven-count Information. DN 1. From 2013 to 2016 the Uptons allegedly stole (and failed to report as taxable income) hundreds of thousands of dollars from an elderly parishioner (the relative of another elderly parishioner they'd cared for) who descended into dementia. *Id.* The Uptons first met the elderly parishioner through Marvin Upton's work as the pastor of Crofton Pentecostal Church. Presentence Report (DN 95) ¶¶ 13–14. After agreeing to plead guilty to all counts on the eve of trial, Upton now seeks to withdraw his plea.

\*

  The case experienced multiple delays—due to Covid, Cynthia's illness and death, lawyers' maternity leave and trial conflicts, and more. With the parties' agreement, the Court finally set this case for trial in July 2023. Two days before jury selection, defense counsel informed the Government and the Court that Upton wished to plead guilty. He did so a week later—but without a written plea agreement. DN 93.

  That hearing suggested the parties might not see eye to eye on the scope and nature of the offenses. The factual basis for the plea, *see* FED. R. CRIM. P. 11(b)(3), contained a series of nonspecific excerpts from the charging document: "from in or about April 2013 through March 2016 … Marvin L. Upton conspired and herein did knowingly execute a material scheme or artifice to defraud … federally insured financial institutions … to obtain money … by material false and fraudulent pretenses … with the intent to deceive and cheat [the parishioner] … [and] did willfully make and subscribe a joint U.S. Individual Tax Return … that … failed to disclose moneys received [from the parishioner]…." COP Transcript (DN 120) at 16:19–17:16 (quoting, in parts, from the Information (DN 1) at 1–5). In some key

1

respects, the agreed factual statement was *less* detailed than the Information, which had specified that Marvin conspired with Cynthia and that the defrauded parishioner suffered from dementia. *Id.* The lawyers didn't explain why their agreed statement omitted these important facts.

Even in response to this barebones statement at the hearing, Upton hesitated and hedged. Asked whether his guilty plea rested on this statement, he avoided a direct response: "There's a whole lot to this … I wasn't aware of a lot of things that should have been done differently, but I understand where I'm at now." *Id.* at 19:6–10. The Court, already harboring some concern regarding the clarity and concreteness of the plea, explained to Upton that the factual basis was "a statement of proof in a case … that would be necessary to support a finding … that [he] did, in fact, do these things that have led to these criminal charges and convictions." *Id.* at 19:14–20. At this point, Upton ultimately agreed that he did the things the Government said and was guilty of all seven counts. *Id.* at 20:8–13.[1]

The gap between the parties' respective views of the facts grew starker at Upton's sentencing, however. The defense and prosecution both filed numerous objections to the PSR. Upton didn't contest that he was responsible for some $500,000 in loss, but disputed that he stole an additional $200,000. First Sentencing Transcript at 28:24–25. According to him, these are funds the parishioner either withdrew as cash or donated to Crofton Pentecostal for church renovations. *Id.* at 26:20–24. They also disagreed about the timing and extent of the parishioner's mental decline, which, as defense counsel put it, would "have an effect on … the overall way that the fraud was perpetrated." *Id.* at 23:2–4. Other disputes less relevant to the factual basis—such as the applicability of various sentencing enhancements—also abounded. *See* PSR Addendum (DN 95-1).

After resolving many of these disputes, the Court adjourned the initial sentencing and set another hearing to allow each side more time to present witnesses and address the sentencing factors. *See* DN 103. That second hearing fell apart almost immediately. After listing the parties' numerous remaining disagreements,

---

[1] In the Court's view this satisfied Rule 11—if only just. "The factual basis requirement" simply "ensure[s] the accuracy of the plea through some evidence that a defendant actually committed the offense." *United States v. Pitts*, 997 F.3d 688, 697 (6th Cir. 2021) (quotation marks omitted). The relevant time period for confirming the factual basis is judgment, not acceptance of the plea: "The record need not reflect the factual basis for the plea agreement when the defendant enters his plea so long as there is a factual basis in the record when the district court enters judgment." *Id.* And as discussed below, the facts grew less rather than more clear between the plea hearing and sentencing. The evidence used to establish the factual basis can include "a statement on the record from the government prosecutors" or "proceedings that occurred *after* the plea colloquy." *Id.* at 697–698. While the prosecutor's statement at the plea hearing, coupled with Upton's acquiescence, technically sufficed under Rule 11, *id.* at 698, that's not dispositive of the question whether Upton may back away from that plea.

the Court voiced its concerns regarding "whether [their] factual disagreement is so great as to cause concerns about the factual basis for the guilty plea." Second Sentencing Transcript (DN 107) at 7:12–16. Specifically, whether the parties shared the Court's "doubt about the conspiracy count, that the Uptons agreed to commit the bank fraud crime?" *Id.* Upton's counsel began to say that he was "accepting responsibility and [had] pled guilty." *Id.* at 7:17–18. But Upton interrupted and disagreed: "We didn't conspire to anything" and the conspiracy was "not true." *Id.* at 8:1–2. After a recess to allow Upton and his lawyer to confer, defense counsel told the Court that Upton would be filing a motion to withdraw his guilty plea. *Id.* at 9:3–4. She also expressed concern that she could ethically argue that he met the standard for withdrawal given her earlier statements in support of the plea. *Id.*; First Sentencing Transcript at 28:19–23; Redacted Motion to Withdraw (DN 114) at 4. The Court granted the motion to withdraw (DN 116) and appointed new counsel (DN 117). Upton's new lawyer filed a motion to withdraw the guilty plea in March 2024 (DN 123), and the Court held a hearing on that motion in May 2024 (DN 130).

\* \*

Based on several in-person interactions with Upton and counsel from both sides during numerous hearings, the Court exercises its discretion to grant Upton's request to withdraw his guilty plea. This is not a decision lightly taken, given its burden on the judiciary, witnesses, and prosecution—and the law's strong presumption that binding guilty pleas should not be unwrapped too easily. But this is the rare plea that was, on balance, "hastily entered … with [an] unsure heart…." *United States v. Alexander*, 948 F.2d 1002, 1004 (6th Cir. 1991). At no point did the parties nail down what happened between Marvin, Cindy, and the parishioner—or why. Nor did Upton ever unequivocally admit the facts that support his guilt. *See* COP Transcript 19:2–20:13. Indeed, when pressed he resisted the Government's account of his actions. Viewed in light of other aspects of the case, Upton's thin colloquy and unwritten agreement support rather than undermine the Court's conclusion that this hasty plea may be withdrawn.

The Federal Rules treat withdrawal as permissible if, "after the court accepts the plea, but before it imposes a sentence," the defendant "can show a fair and just reason for requesting the withdrawal." FED. R. CRIM. P. 11(d)(2)(B). "[T]he aim of the rule is to allow a hastily entered plea made with unsure heart and confused mind to be undone, not to allow a defendant to make a tactical decision … if he believes that he made a bad choice in pleading guilty." *Alexander*, 948 F.2d at 1004 (quotation marks omitted). "[D]istrict courts bear the primary responsibility to resolve whether a defendant has identified a fair and just reason to withdraw a plea," with the courts of appeals reviewing only for abuse of discretion. *United States v. Crowe*, No. 22-6046, 2023 WL 4586154, at *4 (6th Cir. July 18, 2023).

The Sixth Circuit has identified seven "non-exclusive" factors district courts should consider when exercising their discretion in ruling on a motion to withdraw:

> "(1) the amount of time that elapsed between the plea and the motion to withdraw it; (2) the presence (or absence) of a valid reason for the failure to move for withdrawal earlier in the proceedings; (3) whether the defendant has asserted or maintained his innocence; (4) the circumstances underlying the entry of the guilty plea; (5) the defendant's nature and background; (6) the degree to which the defendant has had prior experience with the criminal justice system; and (7) potential prejudice to the government if the motion to withdraw is granted."

*United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir. 1994); *United States v. Bazzi*, 94 F.3d 1025, 1027 (6th Cir. 1996). "No one factor controls" and "[t]he relevance of each factor will vary according to the circumstances surrounding the original entrance of the plea as well as the motion to withdraw." *United States v. Haygood*, 549 F.3d 1049, 1052 (6th Cir. 2008) (quotation marks omitted). Ultimately, "the factors exist to help courts distinguish withdrawal requests made for strategic reasons from those made for legitimate ones." *Crowe*, 2023 WL 4586154, at *4.

Two "legitimate" reasons identified by the Court of Appeals predominate here. One is Upton's sincere desire to assert his innocence before a jury: "A defendant's vigorous and repeated protestations of innocence may support the decision to allow withdrawal of a guilty plea." *United States v. Carson*, 32 F.4th 615, 624 (6th Cir. 2022) (quotation marks omitted). Another is a misunderstanding over the scope of the plea: "Withdrawal of a plea is appropriate where there is a real confusion or misunderstanding of the terms of the agreement." *United States v. Ellis*, 470 F.3d 275, 281 (6th Cir. 2006). Upton has pointed to evidence of both.

*First*, the Court believes that Upton "hastily entered" his plea with an "unsure heart and [potentially] confused mind." *Alexander*, 948 F.2d at 1004. He later testified that he pled guilty with a "foggy mind" because he was grieving his wife's death and worried that prosecutors would "attack her character." Withdrawal Transcript (DN 131) at 34:19–35:7, 10:12–20. Upton undoubtedly "understood what he was doing and the constitutional rights he was waiving when he entered the guilty plea." *Ellis*, 470 F.3d at 285. But even then he gave signs that he "was vacillating in his decision," *United States v. Lewis*, 800 F. App'x 353, 358 (6th Cir. 2020) (quotation marks omitted), regarding the "hastily entered" plea, *United States v. McIntyre*, 381 F. App'x 535, 539–40 (6th Cir. 2010) ("The relatively rapid nature of [the defendant's] decisionmaking … could thus be seen as rushed, and therefore supportive of an argument that his plea was 'hastily entered.'").

The proceedings since that plea hearing indicate that he may well have misunderstood the scope of the plea in critical respects, *Ellis*, 470 F.3d at 281, although he clearly did understand parts of it. There is no question, for example, that Upton knows he faces a serious "potential penalty in the case," and may forfeit the benefits of acceptance of responsibility at a future sentencing. *Cf. United States v. Lee*, No. 23-5584, 2024 WL 991870, at *4 (6th Cir. March 7, 2024) (affirming denial of motion to withdraw after "the district court found that Lee's belated assertions of innocence were not made in good faith, but in an attempt to seek … to lessen the

4

potential penalty in the case") (quotation marks omitted).  And Upton is right that his plea colloquy at a minimum downplayed the import of his conspiracy with his deceased wife—an elision that became more apparent as the case proceeded to sentencing.

The record at this point is crystal clear, moreover, that Upton desires to assert his innocence.  *Alexander*, 948 F.2d at 1004.  Although he ultimately admitted his guilt at the change-of-plea hearing, Upton has vigorously asserted his innocence since—particularly on the conspiracy charge.[2]  At the second sentencing hearing, he asserted that the charges were "not true" and he "didn't conspire to anything."  Second Sentencing Transcript at 8:1–2.  This continued in the *pro se* reply he filed in support of his motion to withdraw; that submission stated that he "will always maintain [his] innocence."  DN 127 at ¶ 17.  At the withdrawal hearing, he claimed (perhaps with more conviction than support) that the charges against him were "lies."  Withdrawal Transcript at 9:9.  Upton's statements and positions have at times been hard to square, to be sure, but the Court finds these core assertions of innocence credible.  His "vigorous and repeated protestations of innocence" thus weigh in favor of granting his motion to withdraw.  *Carson*, 32 F.4th at 624.

*Second*, Upton and the Government disagree about the scope of his guilty plea.  *See Ellis*, 470 F.3d at 281.  Their disagreements have widened over time, and they go to the heart of the plea: whether and how Upton defrauded the parishioner, his wife's role in the fraud, and how much he and wife stole.  Resolving these disagreements would have a significant impact on Upton's advisory guidelines range and ultimate sentence.  *Compare* Defendant's Sentencing Memorandum (DN 96) at 16 (proposing advisory guidelines range of 37 to 46 months), *with* Government's Sentencing Memorandum (DN 97) at 11 (proposing an advisory guidelines range of 57 to 71 months).[3]  Were the Court to deny Upton's motion, it would have to conduct something approaching a mini-trial at sentencing (without the benefit of a jury) to establish these core facts.

Such judicial factfinding would sit uncomfortably alongside the Fifth and Sixth Amendments, which "generally require the government in criminal cases to prove every fact essential to an individual's punishment to a jury beyond a reasonable

---

[2] True, the Sixth Circuit "has repeatedly considered statements made during a plea colloquy when analyzing [whether a defendant asserts his innocence]."  *Lee,* 2024 WL 991870, at *4.  But Upton's statements at the change-of-plea hearing are hardly the sort of full-throated admission of guilt (particularly with respect to his alleged victim and co-conspirator) that the Sixth Circuit has held against defendants seeking to withdraw their guilty pleas.  *See, e.g., United States v. Carpenter*, 554 F. App'x 477, 483 (6th Cir. 2014) (defendant "admit[ted] his guilt at the second hearing and provided details of his conduct beyond the information specifically elicited by the court"); *United States v. Martin*, 668 F.3d 787, 796 (6th Cir. 2012) (defendant "expressly reaffirmed his guilt on numerous occasions").

[3] The Probation Office calculated an advisory guidelines range of 41–51 months, PSR ¶ 101, to which both parties objected.  Government Sentencing Memorandum at 3.

doubt." *Wooden v. United States*, 595 U.S. 360, 397 n.7 (2022) (Gorsuch, J., concurring in the judgment); *cf. Erlinger v. United States*, No. 23-370, 2024 WL 3074427, at *7 (2024) ("Only a jury may find 'facts that increase the prescribed range of penalties to which a criminal defendant is exposed.'"). Though the Court might be able to resolve the parties' disputes itself without violating those Amendments—since the disputed facts don't increase Upton's *statutory* maximum or minimum penalty—allowing Upton to withdraw his plea and proceed to a jury trial is both within the Court's discretion and consistent with the spirit and letter of these key constitutional safeguards. *Cf. Erlinger*, 2024 WL 3074427, at *5–6. Trying a case like this—which involves public trust, private gain, and a vulnerable victim—also promotes public confidence in the judicial system. Jury trials, after all, "ensur[e] that the punishments courts issue … are premised on laws adopted by the people's elected representatives and facts found by members of the community." *Id.* at *6.

* * *

Faced with these "legitimate" reasons for withdrawal, *Crowe*, 2023 WL 4586154, at *4, the Government notes that several *Bashara* factors—delay, defendant's background, and prejudice, most notably—cut in favor of denying Upton's motion.

Yes, he waited 105 days to notify the Court that he wished to withdraw his guilty plea. *See* Government Response at 4. The Sixth Circuit has not "fashioned a precise cut-off point beyond which delay is unreasonable." *Carson*, 32 F.4th at 624. It has, however, held that a shorter period—75 days, for example—may by itself be "enough to uphold the district court's denial of a motion to withdraw a guilty plea." *United States v. Giorgio*, 802 F.3d 845, 848 (6th Cir. 2015). Why Upton didn't move more quickly to withdraw his plea remains unclear. *See Bashara*, 27 F.3d at 1181.[4] This cuts against allowing withdrawal.

The Government also is right that it would face some prejudice from the yearlong delay between plea and withdrawal. Counsel will have to begin trial preparation anew and witnesses' memories will have degraded further. *See United States v. Martin*, 668 F.3d 787, 797 (6th Cir. 2012). In fairness, though, neither side has appeared in a great rush to conclude this case since (at least) its reassignment from the docket of the previously presiding judge.

---

[4] At one point during the plea-withdrawal hearing, Upton stated that he decided that he wanted to withdraw his guilty plea "immediately" after the change-of-plea hearing. Withdrawal Transcript at 12:22. Yet he made no attempt to do so. *Id.* at 13:4–7. Later in the hearing, Upton testified that (at some unknown point) he "had a wake-up call." *Id.* at 22:10 ("I could see [my wife] saying, Marvin, what are you doing? What are you doing?"). But the record doesn't specify when this "wake-up call" occurred. So Upton has not shown that he could not have withdrawn his plea earlier. *See Lewis*, 800 F. App'x at 356 ("The defendant has the burden to demonstrate that proper grounds exist for withdrawing his guilty plea.").

And the Court agrees that nothing in Upton's "nature and background" suggests that he did not know what he was doing when he pled guilty. He has a high school education and an apparently successful work history in multiple fields. *See United States v. Watkins*, No. 21-1241, 2022 WL 43291, at *2 (6th Cir. Jan. 5, 2022) ("Individuals with the equivalent of a high school education do not raise red flags with respect to this consideration."). These aspects of his background are more or less canceled out by his lack of experience with the criminal justice system, though. *Martin*, 668 F.3d at 797. Aside from traffic citations, Upton lacks any personal experience with the criminal process. PSR ¶¶ 66–70. In the end, the Court doubts that either the background or the criminal-experience factors had a significant effect on Upton's decisionmaking—and neither bears significantly on the Court's overall assessment of his request.

Indeed, the Sixth Circuit has cautioned that "courts should not lose sight of the forest (whether a fair and just reason exists) for the trees (whether or how each factor applies)." *Crowe*, 2023 WL 4586154, at *4 (quotation marks omitted). "The outcome does not rest on simply adding up the factors and asking whether more of them favor the government or the defendant." *Id.* Instead, the factors are only valuable insofar as they "help courts distinguish withdrawal requests made for strategic reasons from those made for legitimate ones." *Id.* So tallying a little more than half of the *Bashara* factors for the Government and a little less for Upton is not dispositive.

That leads to the Government's second counterargument. In its view, Upton's desire to withdraw his plea is the sort of "tactical decision" that the Sixth Circuit's caselaw guards against. *See Alexander*, 948 F.2d at 1004; Government Response at 9–10. The opposition brief (at 5) emphasizes that Upton moved to withdraw his plea only after the Court expressed doubts regarding Upton's request for probation or home detention. *See* First Sentencing Transcript at 60:9–61:6 ("[I]f the … seriousness of the offense … in the eyes of the Court called for some substantial … period of incarceration beyond simply a day or a night, do you have a position on what … would be a sufficient, but not greater than necessary, sentence?"). To the Government, Upton's statements at the second sentencing hearing and subsequent motion to withdraw demonstrate that Upton (who has remained on bond with limited restrictions since this case began) "decided to try to withdraw his plea once he realized his sentence would be longer than he had hoped." Government Response at 5. This would be disfavored: Defendants "do not have the right to plead guilty in the hope that the sentencing process will produce a desired sentencing range and to withdraw their plea if that range does not turn out as hoped." *Crowe*, 2023 WL 4586154, at *5.

Upton, of course, sought to backtrack *before* rather than after the Court announced his sentence—or even his guidelines range. To be sure, the circumstances of this case—particularly when viewed on a cold record—could readily support an inference that Upton behaved tactically; an order denying his motion on that basis would surely fall within the discretion afforded a trial judge. But the facts don't compel that conclusion, either. It's certainly possible that Upton became spooked by

7

the Court's rulings on his PSR objections and now seeks to roll the dice with a jury instead. But it's also possible—and, in the Court's view, more likely—that Upton and the Government never had a meeting of the minds regarding his unwritten agreement to plead guilty. Cold feet wouldn't explain the persistent disagreement regarding, most importantly, the existence of a conspiracy and the nature of the funds at issue. Nor would it explain the risk Upton is taking by forfeiting the credit he would've received for admitting guilt, accepting responsibility, and saving the Government and the Court the time and expense of trial. These choices undermine the Government's certitude that Upton is making a wholly tactical decision.

Ultimately the Court, exercising its discretion based on the Sixth Circuit's caselaw and on its observation of multiple hearings focused on the disagreements that led to this point, concludes that Upton has "fair and just reason[s]" to withdraw his plea. FED. R. CRIM. P. 11(d)(2)(B). A public trial would reconcile his personal interest in liberty and due process with the public interest in transparency, efficiency, and justice.

## ORDER

The Court grants Upton's motion to withdraw his guilty plea (DN 123) and orders the parties to file a status report within 7 days regarding their earliest possible dates for trial and any pretrial deadlines the Court may need to address.

Benjamin Beaton, District Judge
United States District Court

July 11, 2024